CHICAGO TITLE & TRUST COMPANY, AS EXECUTOR OF THE ESTATE OF RHEA LOGAN MUNROE, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 73455. Promulgated March 20, 1935.

*Harry J. Rudick, Esq.*, for the petitioner.
*James K. Polk, Esq.*, for the respondent.

OPINION.

ARUNDELL: The statement of the facts here is somewhat complicated by reason of using English terms in some places and American terms in others to describe sums of money. The facts themselves, though, are simple. Mrs. Munroe owned securities which in 1930 were worth less than they had cost her. Faced with an income tax which she wanted to reduce by reflecting in her return shrinkage in value of securities, she transferred the securities to a corporation in which her husband owned all the stock, taking the corporation's note for the current value of the securities, which was $100,922.48 less than cost. That corporation, in February 1931, transferred them to another in which Munroe owned or controlled all the stock, at the then market price, which was about $29,000 (£5,962.12.10) higher than the price at December 16, 1930. The second corporation paid no cash for the securities, but assumed the first corporation's note to Mrs. Munroe and gave its note for the increase in market price. Mrs. Munroe then got the securities back from the second corporation, agreeing to pay therefor an amount of cash $2,193.19 in excess of the amount of the first corporation's note, and giving her note for £5,432.7.5, about $26,000. At or about the time of delivery of the securities to Mrs. Munroe on March 3, 1931, the several accounts were cleared up by exchange of checks in which the only one who profited was Mrs. Munroe. She received $427.88, and the note that she gave to the second corporation was destroyed.

The question presented here is whether Mrs. Munroe suffered a deductible loss in 1930 upon the transfer of her securities to the Inverness Corporation. The answer to this question turns upon whether that transfer was a bona fide sale in which Mrs. Munroe intended " absolutely getting rid of the stock ", *Harold B. Clark*, 2 B. T. A. 555, or whether it was merely an " accommodation " transaction. *Harold B. Clark, supra; J. R. Young*, 6 B. T. A. 656. The community of interest that existed among several parties to the transactions described in the findings requires that their activities be closely scrutinized to see that their transactions were actually what they purported to be and not merely formal acts which, though complying with statutory words, were outside the intent of the

statute. Cf. *Gregory* v. *Helvering*, 293 U. S. 465. The statute is "concerned only with realized losses", *Lucas* v. *American Code Co.*, 280 U. S. 445, and claimed losses, in order to be allowable, must "usually be evidenced by closed and completed transactions." *United States* v. *White Dental Manufacturing Co.*, 274 U. S. 398.

A bona fide sale is, of course, a closed and completed transaction within the intent of the statute. Petitioner here claims that it has established such a sale, pointing to various bits of evidence—the delivery and transfer of the stock certificates, the delivery of the note of Inverness to Mrs. Munroe, and the financial responsibility of Inverness. None of these matters are in dispute. They do not, however, reach the question we have here. Delivery and transfer of certificates, while establishing change of title, do not necessarily prove bona fides, *Wishon-Watson Co.* v. *Commissioner*, 66 Fed. (2d) 52. Surrounding circumstances, including subsequent acts of the taxpayer, often establish intent more clearly than the words of the participants. Cf. *Commissioner* v. *Dyer*, 74 Fed. (2d) 685.

Putting aside for the moment the details of the various transactions and looking at the result, it does not on its face support the claim of a sustained loss. Within three months after Mrs. Munroe made the transfer to Inverness she was again in possession of the same securities, and she also profited on the deal by $427.88, despite the fact that the securities had appreciated some $29,000 in value in the meantime. It is difficult to see in this where any realized loss was sustained.

Taking up the details of the transactions, it is equally hard to find in them support for petitioner's claim. The securities were marketable and had Mrs. Munroe desired to divest herself entirely of ownership she could have sold on the stock exchange. The testimony of Charles A. Munroe is that the reason for not selling on the exchange was to avoid broker's fees. He also testified that Inverness did not have the cash to pay for the securities when it acquired them. But he further testified that the company had "abundant stock exchange collateral" to finance the acquisition, and his testimony in this respect is supported by the balance sheet in evidence. And so, even though Mrs. Munroe could have received cash for her stock, which is the most logical way of effecting an outright sale, she chose the more indirect way of taking a note. The execution of a bill of sale from Inverness to Manistee was another step in the scheme to avoid taxes. While there is no evidence that Mrs. Munroe had anything to do with that transaction, it must be remembered that these companies were dominated by Munroe, and he was the advisor in the several transactions. By reason of the increase in market value of the stocks Inverness was in a position to reap a profit on them. Munroe caused a bill of sale to be executed in the Bahama

254

Islands so as to make the profit appear to have been realized outside the United States, but retaining the securities in the name of Inverness and having them remain in the custody of the agent of Inverness in New York. At the same time he hoped to give Manistee an increased basis for the securities so that there would be no taxable gain on the retransfer to Mrs. Munroe. The bills of sale from Inverness to Manistee and from Manistee to Mrs. Munroe bear the same date, February 9, 1931. Throughout these transactions the guiding hand of Charles A. Munroe is apparent, every move carefully planned to escape taxes, no payment of money involved, and the securities not allowed to get beyond the possibility of ready reacquisition. Finally, Munroe's destruction of Mrs. Munroe's note for £5,432.7.5 (something over $26,000) is not consonant with a bona fide business transaction. It is suggested that this was in substance a gift from Munroe to his wife. But the note did not run to him; it was drawn in favor of a corporation, Manistee. If he and his corporations are to be treated as one, it emphasizes the lack of bona fides in the several transactions to which the corporations were parties. Munroe's explanation of the reason for the destruction of the note is, " I did not want to profit, nor want any company that I owned to profit from a transaction with Mrs. Munroe." This does not square with his other testimony that he insisted upon Mrs. Munroe paying the market price when she expressed a desire to reacquire the securities.

Upon a consideration of all the evidence we are unable to conclude that the transfer of the securities to Inverness in December 1930 was a bona fide sale and we accordingly sustain the respondent's disallowance of the claimed loss.

*Decision will be entered for the respondent.*