W. P. Sewell v. Commissioner. R. B. Sewell v. Commissioner. Estate of R. A. Sewell, Josephine M. Sewell, Executrix v. Commissioner.
Sewell v. Commissioner
Docket Nos. 112298, 112299, 112339.
United States Tax Court
1944 Tax Ct. Memo LEXIS 380; 3 T.C.M. (CCH) 106; T.C.M. (RIA) 44040; February 7, 1944
*380 Wilton H. Wallace, Esq., and E. F. Colladay, Esq., for the petitioners. J. Marvin Kelley, Esq., for the respondent. DISNEY
Memorandum Findings of Fact and Opinion DISNEY, Judge: These proceedings, consolidated for opinion, are for the redetermination of the following income tax deficiencies and penalties. Docket No.
Year
Deficiency
Penalty
112298
1934
$ 3,940.06
$ 1,425.98
1935
4,492.52
1,823.23
1936
19,920.99
9,960.49
1937
6,645.98
3,322.99
112299
1935
$ 2,419.07
$ 1,209.54
1936
6,497.12
3,248.56
1937
4,087.87
2,043.94
112339
1934
$ 6,181.82
$ 3,205.51
1935
11,823.58
5,911.79
1936
36,359.24
18,179.62
1937
1,370.85
685.43
The issues are as follows: First, whether dividends on certain stock of Sewell Manufacturing Co. are taxable to petitioners W. P. Sewell and R. B. Sewell, and to the decedent R. A. Sewell, or to their respective wives, alleged to be owners of the stock by reason of gifts from their husbands; Second, whether dividends paid in 1937 on certain stock of Hubbard Pants Co. are taxable to the petitioner, R. B. Sewell, or to his wife, Mary W. Sewell, alleged to be the owner of the stock by reason of a gift from *381 her husband; Third, whether amounts credited as interest by Sewell Manufacturing Co. to the wife of W. P. Sewell and to the wife of R. A. Sewell are taxable to the wives or to their respective husbands; Fourth, whether profits on sales of certain Sewell Manufacturing Co. stock standing in the name of the wife of R. A. Sewell are taxable to her or to her husband; Fifth, whether profits on sales, under certain so-called pledge contracts, of stock standing in the name of R. A. Sewell and stock standing in the name of his wife are taxable in 1936 or 1937; Sixth, whether the profits for 1936 and 1937 of a certain hat manufacturing business are taxable in their entirety to R. A. Sewell, or whether the business was a partnership and its profits taxable to the alleged partners in proportion to their respective shares. Seventh, whether W. P. Sewell is entitled to deduct in 1934 the amount of certain farm expenses incurred and paid by him in 1933. Eighth, whether the entire amounts deducted by R. B. Sewell for traveling and other expenses incident to his business as a salesman, or only portions thereof, are allowable; Ninth, whether W. P. Sewell and R. B. Sewell are liable for the fraud *382 penalties determined against each of them. Other issues raised by the pleadings have been abandoned or conceded. Findings of fact and opinion as to the issues remaining in controversy will be set forth separately. Findings of Fact Applicable to the First Issue (Whether Dividends Taxable to All Petitioners) The petitioners are residents of Atlanta, Georgia. R. A. Sewell the petitioner's decedent in Docket No. 112339, was a brother of W. P. Sewell and R. B. Sewell, the petitioners in Docket Nos. 112298 and 112299, respectively. In 1919 or 1920 the three Sewell brothers became associated in business as manufacturers of mens' and boys' clothing. For a time the business was operated as a partnership, but in 1931 it was incorporated under the laws of the State of Georgia as Sewell Manufacturing Co., hereinafter sometimes called the company. Since the time of incorporation the three brothers and their respective families have been the principal stockholders. At the close of the year 1933, 5,000 shares of stock of the part value of $20 each were outstanding. Of that number, 1901-3/20 were owned by W. P. Sewell, 675 by R. B. Sewell, 2023-17/20 by R. A. Sewell, and the remaining 400 *383 by A. R. Lovvorn, secretary of the corporation. With the exception of three certificates issued to W. P. Sewell for 100 shares each, none of the stock certificates had then ever been, nor were they ever subsequently detached from their stubs in the stock certificate book. The book itself was in the custody of A. R. Lovvorn, and was at all times kept in the vault at the company's offices. On January 2, 1934, the three brothers discussed among themselves the advisability of making transfers of some of their stock to their wives. R. B. Sewell decided to think the matter over, but W. P. and R. A. Sewell decided then to make such transfers. At their direction the accountant for the company prepared a certificate for 950 shares in the name of Ava F. Sewell, the wife of W. P. Sewell, and five certificates for a total of 1,000 shares in the name of Josephine M. Sewell, the wife of R. A. Sewell. All were signed by the proper officers and the corporate seal was affixed on that day. Certificates for 1,000 shares in the name of R. A. Sewell and 1,000 shares in the name of W. P. Sewell were canceled. A new certificate for 50 shares was issued to W. P. Sewell. Neither Josephine M. Sewell nor Ava *384 F. Sewell was present at the time of the issuance of the certificates. Neither has ever had actual possession of them. Each was advised by her husband that a gift of the stock had been made. The certificates remained at all times attached to their stubs in the stock book at the company's office. In December 1934, R. B. Sewell endorsed certificates in his name totaling 500 shares of Sewell Manufacturing Co. stock, and directed the accountant of the corporation to transfer 500 shares to his wife, Mary W. Sewell, on January 1, 1935. The transfer was not actually effected until June 1935. R. B. Sewell at that time directed that a certificate for 500 shares be issued to his wife to be dated as of January 1, 1935, and that his certificates totaling that number be canceled. Those directions were carried out. Mary W. Sewell was not present when her certificate was issued. She had been told by her husband in December 1934 that he was going to make the gift on January 1, 1935, but she did not see her certificate until sometime in the summer of 1935. The certificate was never actually delivered to her, but was permitted to remain in the stock book of the corporation. On July 31, 1936, the *385 accountant for the company, at the direction of R. A. Sewell, procured the issuance of a certificate for an additional 300 shares to Josephine M. Sewell, and at the same time canceled two certificates totaling 300 shares then standing in the name of R. A. Sewell. As in the cases of the other earlier transfers, Josephine M. Sewell was not present when the certificate was issued, and never had actual physical possession of it. It remained in the stock book of the company. W. P. Sewell filed a gift tax return for 1934 and R. A. Sewell filed gift tax returns for 1934 and 1936 on which each reported making gifts of the stock issued in the names of their respective wives in those years. After examination, the Commissioner of Internal Revenue assessed additional tax against each as the result of adjustments increasing the value of the stock over the amounts reported on the returns. In each case, after negotiations between the accountant retained by the Sewells and representatives of the Commissioner, valuations were agreed upon and the tax liability of the donors was determined accordingly. During the course of these negotiations, the Commissioner did not question the making of the gifts, *386 nor their validity. In the case of R. A. Sewell, the amount of tax liability for 1936 was not finally settled until March 22, 1939. A timely gift tax return reporting the transfer in 1935 of 500 shares of stock to the wife of R. B. Sewell was not filed. Upon learning that no return had been filed, R. B. Sewell directed the accountant to prepare and file one immediately. Such return was filed on September 15, 1940. None of the wives of the three Sewell brothers took any part in the management or business of the company. None of them ever had notice of or attended any stockholders' meetings. Each of them came to the office occasionally, from time to time, and each had access to the vault, which was left open during business hours. Josephine M. Sewell, at the time of or subsequent to the issuance of the certificates to her endorsed them in blank. Some of the endorsements were not made until about the times her shares were sold. At sometime during the summer of 1935, Mary W. Sewell endorsed in blank the certificate for 500 shares issued in her name. She did so in order that her husband might pledge it as collateral for a loan should he wish to borrow money on it. The certificate for *387 950 shares issued in the name of Ava F. Sewell was not endorsed. During the taxable years cash dividends declared by the company on the stock standing in the names of Josephine M. Sewell, Ava F. Sewell and Mary W. Sewell, and reflected by credits to their respective accounts on the books of the company, were as follows: Josephine
Ava F.
Mary W.
M. Sewell
Sewell
Sewell
1934
$14,000.00
$13,300
None
1935
17,238.80
20,900
$11,000
1936
15,767.80
35,400
18,464
1937
None
17,840
8,928
Totals
$47,006.60
$87,440
$38,392 Dividends payable on and before March 31, 1934, on the stock standing in the names of Josephine M. Sewell and Ava F. Sewell amounted to $4,000 and $3,800, respectively. In each instance those amounts had been credited originally to the accounts of R. A. Sewell and W. P. Sewell, respectively. Transfers of the credits were effected by debits to the account of R. A. Sewell in the total amount of $4,000 and corresponding credits to the account of Josephine M. Sewell, on November 3, 1934, and by similar adjusting entries made in the accounts of W. P. Sewell and Ava F. Sewell on December 26, 1934. Dividends payable prior to June 26, 1935, on the *388 500 shares of stock transferred to the name of Mary W. Sewell, amounted to $8,500. Credits therefor, totaling that amount, had been entered in the account of R. B. Sewell at the times of declaration and payment of the dividends. On June 26, 1935, at the direction of R. B. Sewell or that of A. R. Lovvorn, the company bookkeeper transferred that amount to the account of Mary W. Sewell. With the foregoing exceptions, all dividend credits to the accounts of the respective wives were entered therein on the date of declaration and payment. In addition to credits representing dividends, there were also credited to the accounts of Josephine M. Sewell, Ava F. Sewell and Mary W. Sewell during the taxable years the following amounts: Josephine
Ava F.
Mary W.
M. Sewell
Sewell
Sewell
1934
$15,000.00
$ 500.00
None
1935
62,084.72
8,038.37
None
1936
98,684.00
None
None
1937
None
3,000.00
None
Totals
$175,768.72
$11,538.37
None In the case of Josephine M. Sewell the additional amounts were made up almost entirely of the proceeds of sales of stock or the proceeds of loans [1] on stock standing in her name. In the case of Ava F. Sewell, the additional amounts were *389 principally made up of transfers to her personal account from an account of notes payable to her by the company, and of a transfer from the account of A. R. Lovvorn, representing a payment on a loan which she had made to him. On June 27, 1937, the balance standing to her credit in the notes payable account, in the amount of $7,444.53, was transferred to the account of W. P. Sewell. During the taxable years amounts standing to the credit of Josephine M. Sewell, Ava F. Sewell and Mary W. Sewell were transferred, from time to time, to the accounts of their respective husbands. In every case the amount transferred represented the then entire credit balance in the account from which it was transferred. These transfers were as follows: From
Josephine
Ava F.
Mary W
account
M. Sewell
Sewell
Sewell
R. A.
W. P.
R. B.
to account
Sewell
Sewell
Sewell
Dec. 31, 1934
$13,800.00
May 20, 1935
$ 38,177.77
Oct. 21, 1935
68,988.17
18,957.60
$10,000.00
Dec. 30, 1935
697.70
1,188.15
1,000.00
Oct. 31, 1936
85,751.80
26,600.00
Dec. 18, 1936
28,700.00
Dec. 31, 1936
8,800.00
1,210.00
Dec. 31, 1937
6,112.75
6,793.59
Totals
$222,255.44
$75,458.50
$19,003.59
*390 The only debits to the account of Josephine M. Sewell other than those made to effect transfers to the credit of R. A. Sewell, amounted to about $520, which represented principally payments made by the company for her to the Collector of Internal Revenue and to the Georgia State Tax Commissioner. Debits to the account of Ava F. Sewell, other than those made to effect transfers to the credit of R. A. Sewell, amounted to about $23,600. Of that amount, about $7,500 represented payments made by the company for her to the Collector of Internal Revenue and to the Georgia State Tax Commissioner; about $5,100 represented the price of additional stock purchased with funds from her account and issued in her name; $6,000 represented a loan made to A. R. Lovvorn; and about $5,000 represented amounts transferred to her credit as notes payable. Debits to the account of Mary W. Sewell, other than those made to effect transfers to the credit of R. B. Sewell, amounted to about $19,400. Of that amount, about $2,700 represented payments made by the company for her to the Collector of Internal Revenue and the Georgia State Tax Commissioner; the balance of about $16,700 represented amounts paid for stock, *391 or loaned on pledge of stock, [2] standing in the name of Josephine M. Sewell. The transfers of the credits to the accounts of the husbands were made by the bookkeeper of the company at the direction of A. R. Lovvorn, the secretary. In some instances the husbands requested Lovvorn to have them made, but in others, particularly those at the end of each year, they were made at Lovvorn's direction without specific authorization from any one. Each wife knew that her husband made use of some of the dividends standing to her credit. Each had agreed with her husband that he could make use of them at any time he needed money. W. P. Sewell executed promissory notes payable to his wife, Ava F. Sewell, for each of the three transfers made to his account on and prior to December 30, 1935. The notes were not delivered to Ava F. Sewell, but were placed by the company bookkeeper in a drawer in the vault used jointly by her and her husband for keeping deeds, notes and other papers. Notes covering the transfers to W. P. Sewell made during 1936 and 1937 were not executed during those years. In April 1939, their absence *392 was called to the attention of the bookkeeper by the internal revenue agent examining the transactions. The bookkeeper then prepared notes for $5,000, $8,800, [3] and $6,112.75, and dated them October 31, 1936, December 31, 1936, and December 31, 1937, respectively. They were signed by W. P. Sewell a day or two subsequent to their preparation. No payments were made on any of the notes until December 1941. At that time W. P. Sewell deeded to his wife four parcels of real estate, of the aggregate value of $10,250 according to an appraisal made by the Atlanta Real Estate Board. At the same time, he endorsed and delivered to her two promissory notes of which he was the holder, in the respective amounts of $2,890 and $2,595. The appraised value of the real estate plus the amount of the first note, amounting in all to $13,140, was credited as a payment of principal on the note for $13,800 representing the credit transfer of December 31, 1934. The note for $2,595 was credited as a payment of principal on the note for $18,957.60 representing the credit transfer of October 21, 1935. No other payments, of principal or interest, have ever been made. On or about the date of the conveyance of the *393 real estate to her, Ava F. Sewell made deeds for the same properties to the children of herself and W. P. Sewell. R. B. Sewell executed promissory notes payable to his wife, Mary W. Sewell, for each of the transfers made to his account on October 21, 1935, December 30, 1935, and December 31, 1937. A note for $1,210 representing the transfer of December 31, 1936, was prepared by the company bookkeeper, but it was never signed. The notes were not delivered to her, but were placed by the bookkeeper in the company vault with other papers of her own and her husband. The notes have been exhibited to her on various occasions. On December 31, 1941, and December 31, 1942, transfers from the account of R. B. Sewell to her credit amounted in the aggregate to $10,298.40. Of that amount $10,000 was credited as in full payment of the principal of the note of October 21, 1935, and $298.40 as partial payment of the note of December 31, 1935. On December 24, 1940, $6,793.59 was transferred from the account of R. B. Sewell to the credit of Mary W. Sewell. She then endorsed the note of December 31, 1937, as paid. No payments of interest have *394 been made on any of the notes. R. A. Sewell did not execute promissory notes for any of the amounts transferred to his account from that of his wife. He used the funds so transferred, together with other money, in the organization of a hat manufacturing business and for the construction and equipment of its building and plant. During the taxable years the accounts of W. P. Sewell and Ava F. Sewell were consolidated for the purpose of computing interest. If together they reflected a credit balance on which interest was owing from the company, the amount owing was credited to the account of W. P. Sewell; if they reflected a debit balance on which the company was entitled to interest, the amount owing was charged to the account of W. P. Sewell. His account was also charged with amounts credited to his personal bank account from time to time and charged by the bank against funds which the company had on deposit. Ava F. Sewell had authority to draw checks against his bank account without limit. In February 1940 and thereafter the company charged her personal account with the amounts charged against it on account of checks drawn by her. Similarly, since 1940 or 1941, the company has debited *395 the account of Mary W. Sewell with the amounts charged against it by the bank for her account. W. P. Sewell and R. B. Sewell had occasion at various times to prepare and file financial statements with banks and credit institutions. W. P. Sewell filed such a statement with the Bank of Fulton County, East Point, Georgia, showing his financial condition as of January 1, 1935, on which he stated the value of "stocks and bonds other than U.S." owned by him to be $250,000. On January 1, 1935, the aggregate book value of the 1,900 shares of stock in Sewell Manufacturing Co. standing half in his name and half in the name of Ava F. Sewell was approximately $250,000. A statement filed by him with another financial institution showing his financial condition as of October 26, 1935, listed 1,900 shares of Sewell Manufacturing Co. stock as owned by him. On another statement dated January 22, 1937, showing his financial condition as of January 1, 1937, under "Assets" he wrote "Stock owned by wife but controlled by me $139,106," immediately under which he inserted the following: "Note I have given for tax purposes to Mrs." The latter words were stricken out by W. P. Sewell with pen and ink. On *396 a statement of condition as of January 1, 1938, he stated the value of Sewell Manufacturing Co. stock owned by him to be $400,000. None of the foregoing statements disclose any liability of W. P. Sewell to Ava F. Sewell. R. B. Sewell filed a statement of his financial condition as of April 1, 1935, with the First National Bank of Atlanta, Georgia, on which he included in his own assets the 500 shares of Sewell Manufacturing Co. stock which he had previously instructed the accountant for the company to transfer to the name of his wife. In a statement dated February 10, 1936, he expressly stated that the value of 500 shares of Sewell Manufacturing Co. stock owned by his wife was not included among his assets shown thereon. A similar notation was made on a statement dated January 19, 1937, but the following additional note was also written thereon: "558 shares of Sewell Mfg. Co. - owned by my wife and controlled by me - are not included." None of the foregoing statements filed by R. B. Sewell disclose any indebtedness to Mary W. Sewell. Two statements filed by R. A. Sewell with an Atlanta bank, purporting to show the financial condition of "R. A. Sewell operating as Sewell Hat Manufacturing *397 Co."; on May 31, 1936, do not disclose any proprietary interest in Josephine M. Sewell nor any indebtedness to her. The same is true of another statement filed with a different bank at the same time. None of the stock transfers in question were intended by the Sewell brothers to vest dominion and control over the shares of stock transferred in their respective wives. It was their intention to retain, and they did retain, that control and dominion in themselves. Each of the wives knew such intention existed, and each impliedly agreed that her husband retain control over the stock in her name. Completed gifts of the stock certificates so transferred were not made. Josephine M. Sewell, Ava F. Sewell and Mary W. Sewell each reported as her own income the amounts credited to her account as dividends during the taxable years. The respondent determined that the dividends were taxable to R. A. Sewell, W. P. Sewell and R. B. Sewell, respectively, and adjusted net income reported by each accordingly. The amounts of the adjustments for the years 1935 and 1936 in the cases of R. A. Sewell and W. P. Sewell varied slightly from the amounts reported by their wives, but the petitioners do not assign *398 error with respect to the differences. Opinion Whether the dividends here in question are taxable to the three Sewell brothers or any of them, or to their respective wives, depends upon whether valid and effectual gifts of the stock were made to the wives. The respondent in substance takes the view that there were lacking in each case three of the elements of a bona fide gift inter vivos, namely, "a clear and unmistakable intention on the part of the donor to absolutely and irrevocably divest himself of the title, dominion, and control of the subject matter of the gift, in praesenti; the irrevocable transfer of the present legal title and of the dominion and control of the entire gift to the donee, so that the donor can exercise no further act of dominion or control over it; and a delivery by the donor to the donee of the subject of the gift or of the most effectual means of commanding the dominion of it." Those are among the elements which, in Adolph Weil, 31 B.T.A. 899, 906 affd., 82 Fed. (2d) 561 (C.C.A., 5th Cir.) quoted by the respondent as above, were stated to be essential to the consummation of a valid *399 gift. Each of them has frequently been recognized as essential, and the absence of one or more of them has been held determinative of the nonexistence of alleged gifts. See, e.g., Allen-West Commission Co. v. Grumbles, 129 Fed. 287; Jackson v. Commissioner, 64 Fed. (2d) 359, 360; Oscar G. Joseph, 32 B.T.A. 1192; Lunsford Richardson, 39 B.T.A. 927, 932; Empire Trust Co. et al., Executors, 41 B.T.A. 839, affd., 119 Fed. (2d) 421. If any of them was lacking in the instant cases our decisions must be for the respondent. We consider first whether the alleged donors may be said to have intended to divest themselves and did divest themselves completely and finally of title, dominion and control of the stock in question. The subjective state of mind of each of them must be found not only from their testimony of what they intended, but also from an examination of all the circumstances surrounding each transaction. As was said in Chicago Title & Trust Co., Executor, 32 B.T.A. 249, 253, *400 "Surrounding circumstances, including subsequent acts of the taxpayer, often establish intent more clearly than the words of the participants." Cf. Theodore C. Jackson et al., Administrators, 32 B.T.A. 470, 477, and cases there cited; and Arthur M. Godwin, 34 B.T.A. 485, 492. In the instant proceedings, we think the actions of the parties subsequent to the transfers in question were such as to negative the existence of donative intent in each case. We will discuss briefly some of the several factors which lead us to that conclusion. Both Josephine M. Sewell and Mary W. Sewell endorsed in blank the certificates issued to them, the latter shortly after the time of issuance. Josephine testified that some of the certificates issued in her name were not endorsed until about the time the shares they represented were sold. That testimony fails to place satisfactorily the actual time of the endorsements, since sales of stock standing in her name occurred in each of the years 1934, 1935, 1936, and, according to her contention, 1937. The periodic transfers of the entire credit balances from the accounts of the wives furnishes *401 further evidence of dominion exercised by their husbands over the stock in question. In the case of R. A. Sewell the aggregate of the amounts transferred during the taxable years, $222,255.44, was but about $520 less than the sum of all the amounts credited. The credits to his wife's account were all traceable to the stock standing in her name, either from dividends, sales or loans. In the case of W. P. Sewell the total amounts transferred, $75,458.50, were about $23,600 less than the sum of all the amounts credited to his wife. Of the $23,600, about $5,000 was transferred to her notes account, the entire credit balance of which was in turn transferred to her husband's account. The remaining amounts were used in payment for stock transferred to her name from the name of Josephine M. Sewell, in payment of federal and state taxes, and for a loan to A. R. Lovvorn. With respect to the transfer of $26,600 on October 31, 1936, it is contended that only $5,000 was a loan and that the remaining $21,600 was in payment for 150 shares of stock. An examination of the accounts of W. P. and Ava F. Sewell, and of the stock certificate in question, leads us to conclude that the transfer was originally *402 recorded without explanation, and that subsequently there was written in "21,600 - 150 shares 5,000, loan," in the account of Ava F. Sewell, and "21,600 stock 5,000 LOAN," in the account of W. P. Sewell. A certificate for 150 shares of stock issued under date of October 31, 1936, quite evidently bore the name W. P. Sewell, as originally drawn, but has since been altered by the insertion of "Mrs." immediately before and partially above his name. In the case of R. B. Sewell the total amounts transferred, $19,003.59, were equal to approximately one-half of the sum of all the amounts credited to his wife, all of which represented dividends on the stock standing in her name. The remaining amounts were used for the purchase of additional stock in her name from Josephine M. Sewell, or for loans to Josephine M. Sewell and for the payment of state and federal taxes. It does not appear that the wives had specific knowledge either of the foregoing transfers or of the other entries made in their accounts from time to time, much less that they had any voice in the transactions which the entries purport to reflect. One instance, we think, typifies the extent to which they were permitted to remain *403 in ignorance. A debit to the account of Mary W. Sewell under date of October 31, 1936, in the amount of $8,352 is explained on the books as a loan to Josephine M. Sewell. At the hearing the bookkeeper testified that the loan had actually been made by R. B. Sewell and should have been charged to his account rather than his wife's, although on that date R. B. Sewell's account reflected a debit balance of some $2,200; but that correcting entries had not been made because the error was not discovered until after these proceedings had been instituted. When questioned about the matter, Mary W. Sewell admitted that she had not been told of the error, and had no knowledge of it until hearing the bookkeeper's testimony. It is difficult to imagine that any one with the substantial interest which it is contended she had, would not be informed fully and promptly of an item involving that amount of money. It is our opinion that the husbands at all times intended to retain and did retain complete control over the accounts of the wives, dictating the entries to be made and the transactions they represented as best suited their own conveniences. This conclusion finds support not only in the evidence *404 as to what was actually done, but in the testimony of the interested parties themselves. W. P. Sewell testified that he used the dividends credited to his wife as he saw fit in the business. His wife testified that he had always handled her affairs, thate he had authority to do so, and that he did as he saw fit with her stock. R. B. Sewell testified that his wife had agreed that he might use any money standing to the credit of her account. His wife testified that her dividends were at her husband's disposal, and that it was understood that he might use the money any time he needed it and she didn't. Josephine M. Sewell testified that the evidence given by Ava F. Sewell and Mary W. Sewell with regard to the dividends on their stock applied as well to those on the stock in her name. Prior to the hearing she told an agent of the Bureau of Internal Revenue that her husband had her permission to use the dividends for the company's benefit. Other circumstances lend support to the conclusion that complete and final gifts of the stock were not intended and were not made. The making of financial statements by W. P. Sewell and R. B. Sewell, in which they held themselves out as owning or controlling *405 the stock issued to their wives, and in which they failed to disclose any liability for the amounts they now claim to have borrowed from them, is one. The fact that the statements filed byR. A. Sewell disclosed no interest in the hat manufacturing business in his wife or any liability to her, is another. That no notes were given for some of the alleged loans, that others were not made until these transactions were under investigation by the Bureau of Internal Revenue, and that no payments were made on any of the notes for several years after their execution, and then at a time when the nature of the transactions was in question, are others. Some of the circumstances we have noted as discrediting the petitioners' contention are unexplained. Most of the others are claimed to have resulted from errors and oversights on the part of the company accountant, the bookkeeper or the Sewell brothers themselves. Undoubtedly some actual errors may have been made. On the whole evidence, however, we can not say that the petitioners have established the existence of donative intent which must necessarily have been present in order for them to prevail on this issue. The assessment of gift taxes and *406 the subsequent additional assessments were based upon representations, implicit in the filing of returns by the alleged donors, that gifts had been made. For gift tax purposes there never was any reason to question the bona fides of the gifts. Nothing in the nature of an estoppel against the position now asserted by the respondent can be said to have arisen from his prior actions predicated upon representations made by the petitioners themselves; and estoppel is not pleaded. It has frequently been held that a manual delivery of stock certificates is not always necessary to consummate a valid gift of the stock, and under certain circumstances transfer on the books of the corporation in itself has been regarded as a sufficient delivery. Marshall v. Commissioner, 57 Fed. (2d) 633; see also Owen v. Commissioner, 53 Fed. (2d) 329, 332, and Kathryn Lammerding, 40 B.T.A. 589, 596; Essie Irene Gaffney, Executrix, 36 B.T.A. 610, 614. In view of the conclusions we have already expressed, however, it becomes unnecessary for us to decide whether the manner of delivery *407 to the alleged donees would have been sufficient had the other circumstances been different. On the first issue we sustain the respondent. Findings of Fact as to the Second Issue (Whether 1937 Dividends Taxable to R. B. Sewell) On June 28, 1935, a certificate for 100 shares of $50 par value capital stock of Hubbard Pants Co., a Georgia corporation, was issued in the name of the petitioner, R. B. Sewell. The certificate itself was permitted to remain in the stock certificate book of the issuing corporation until August 28, 1936, when it was detached and delivered to the petitioner. On January 1, 1937, he endorsed it in favor of his wife, Mary W. Sewell, and at that time told her he was giving her 100 shares of stock of Hubbard Pants Co. The certificate was never delivered to her, but was kept in the vault of Sewell Manufacturing Co. No report of a transfer of ownership was reported to the corporation. On December 22, 1937, Hubbard Pants Co. declared a 40 per cent dividend to be paid in cash or in stock, at the option of the stockholder. R. B. Sewell was not present at the meeting but learned of the declaration shortly thereafter. On December 27, 1937, he notified the secretary-treasurer *408 of the corporation that he had given his stock to Mary W. Sewell about the first of the year, and requested that the dividend be paid in stock and that the certificate therefor be issued in her name. Four or five weeks later the original certificate was delivered to the corporation and its transfer was effected by the issuance of a new certificate for 100 shares in the name of Mary W. Sewell. At the same time another certificate for 40 shares was issued in her name in payment of the dividend. Both certificates were dated December 27, 1937, the date when the secretary-treasurer had been informed of the gift. Both were permitted to remain in the stock book of the corporation until July 12, 1938, when they were detached and delivered to Mary W. Sewell. On March 8, 1938, R. B. Sewell filed a gift tax return for 1937 on which he reported making a gift on January 5, 1937, of 50 shares of common stock in Hubbard Pants Co. The accountant who prepared the return inadvertently stated that the number of shares had been 50 instead of 100. Mary W. Sewell reported $2,000. the par value of 40 shares of Hubbard Pants Co. stock as taxable income from dividends on her 1937 income tax return. The respondent *409 determined that that amount was taxable to R. B. Sewell and adjusted his reported net income accordingly. R. B. Sewell did not make a completed gift of his 100 shares of Hubbard Pants Co. stock to Mary W. Sewell in 1937. Opinion Whether the dividend here in question is taxable to the petitioner or to his wife depends upon whether he or she was the owner of the stock on which it was declared on December 22, 1937. That question in turn depends upon whether an effectual gift had previously been made to her. The evidence establishes that the petitioner endorsed the certificate in her favor and had told her that he had made her a gift of the shares. The petitioner contends that the original certificate was also delivered to her, and he so testified. However, his wife stated positively that it was the new certificate which was handed to her in July 1938, and that she had not had possession of the original. We conclude that no actual delivery occurred, and that W. P. Sewell retained possession until the certificate was surrendered and the new one issued. Nor was there any constructive delivery in 1937. The mere endorsement of the certificate in favor of the wife, without delivery to her, *410 or to some one for her, or without a transfer on the books of the corporation, can not be said to have satisfied this essential element of a completed gift, even though the alleged donee was advised by the petitioner that a gift had been made. Marshall v. Commissioner, 57 Fed. (2d) 633; Sizer v. United States, 65 Ct. Cl. 450. It does appear that the petitioner intended at sometime to make a gift to his wife, but there was no time during the taxable year when she may be said to have had dominion over it. R. B. Sewell did not vote the stock, but could have done so had he wished, having both the possession and record title. It was at his direction and not his wife's that the dividend was paid in stock rather than in cash. We conclude and hold that a valid gift had not been made on or prior to the declaration of the dividend in question. On this issue the respondent's determination is sustained. Findings of Fact as to the Third Issue (Taxation of Credits to Wives of W. P. Sewell and R. A. Sewell) We incorporate herein by reference the findings of fact as to the first issue, in so far as they relate to the proceedings *411 of W. P. Sewell and the Estate of R. A. Sewell, and find the following additional facts: During the taxable years the following amounts were entered as interest to the credit of Ava F. Sewell and Josephine M. Sewell on the books of Sewell Manufacturing Co.
Josephine M.
Date
Ava F. Sewell
Sewell
Dec. 31, 1934
$480.00
May 1, 1935
$ 69.00
May 20, 1935
201.60
May 31, 1935
$641.87
Dec. 7, 1935
287.77
Totals (1935)
$558.37
$641.87
Oct. 19, 1936
$168.71
June 29, 1937
$236.20
June 29, 1937
40.00
Total (1937)
$276.20
The credit of $69 on May 1, 1935, to the account of Ava F. Sewell, and that of $641.87 on May 31, 1935, to the account of Josephine M. Sewell represent interest on the average credit balance in their respective accounts for the period January 1, to May 1, 1935. With the exception of the $287.77 credited to Ava F. Sewell on December 7, 1935, the remainder of the foregoing credits represented interest computed on amounts loaned by Ava F. Sewell from funds of her own to Sewell Manufacturing Co. The credit of December 7, 1935, represents interest on a loan made by her to A. R. Lovvorn, the amounts of the credit having been charged against *412 his account. The only amounts standing to the credit of Ava F. Sewell and Josephine M. Sewell during the period January 1, 1935, to May 1, 1935, resulted entirely from dividends paid by the company. Josephine M. Sewell reported the credit of $641.87 as her income on her return for 1935. Ava F. Sewell reported all the amounts credited to her as interest during the taxable years as her income. The respondent determined in each instance that the interest credits were taxable to W. P. Sewell and R. A. Sewell, respectively, and adjusted their reported net income accordingly. Opinion With regard to the credits made in May 1935, representing interest on the average credit balances in the accounts of Ava F. Sewell and Josephine M. Sewell, our decision is governed by our opinion on the first issue. We held there that the dividends on the stock standing in the names of the wives, although credited to their accounts, were taxable to their husbands. It follows that the interest accruing thereon and also credited to their accounts is taxable to the husbands. The respondent properly so determined. The remainder of the credits in question are all in the account of Ava F. Sewell and represent *413 interest on loans made by her to the company and to A. R. Lovvorn. The evidence establishes that the loans to the company were made from funds of her own, and an examination of her account leads us to conclude that the same is true with regard to the loan to Lovvorn. It follows that as to these latter amounts the respondent's determination was in error. Findings of Fact as to the Fourth and Fifth Issues (Taxation of Profits on Stock Sales as to R. A. Sewell, or Wife) We incorporate herein by reference the findings of fact as to the first issue in so far as they relate to the proceeding of the Estate of R. A. Sewell, and find the following additional facts: On December 29, 1934, 123-17/20 shares of Sewell Manufacturing Co. stock, standing in the name of Josephine M. Sewell, were sold to C. E. Graybill for $14,930.12. A taxable profit was realized on the sale, but was not reported either on Josephine M. Sewell's return or that of her husband. On different dates during 1935 an aggregate of 527-3/10 shares of Sewell Manufacturing Co. stock standing in the name of Josephine M. Sewell was sold to various persons for prices totaling $61,442.85. Taxable gain from these sales in the *414 amount of $23,672.66 was reported as her income on her 1935 return. On October 31, 1936 an aggregate of 243 shares of stock standing in her name was sold to various persons for prices totaling $34,992. Taxable gain from these sales in the amount of $9,943.56 was reported as her income on her 1936 return. On October 31, 1936 Josephine M. Sewell entered into a written contract with A. R. Lovvorn under the terms of which she assigned to him 35 shares of Sewell stock as security for a loan of $5,040. The contract provided that the assignee receive all dividends on the pledged stock in lieu of interest, and that the pledgor (Josephine M. Sewell) within three years either repay the loan in cash, or surrender the stock held as collateral "it being understood and agreed that said value of said * * * shares shall not be less than * * *" the amount of the loan. On the same date she entered into a contract having the same terms with W. P. Sewell, assigning to him 150 shares of Sewell stock as security for a loan of $21,600, and another similar contract with R. B. Sewell assigning 58 shares of Sewell stock as security for a loan of $8,352. On December 18, 1936 she made a similar contract with *415 A. R. Lovvorn assigning 30 shares of Sewell stock to secure a loan of $5,250, and another with R. B. Sewell assigning 44 shares to secure a loan of $7,700. Also on that date she and R. A. Sewell, her husband, entered into a similar contract with W. P. Sewell, under which they assigned 110 shares of Sewell stock to secure a loan of $19,250. Of that number, 90 shares were in her name and 20 in the name of R. A. Sewell. R. A. Sewell, alone, entered into a similar contract with W. P. Sewell on the same day assigning 400 shares of stock to secure a loan of $59,400. The amounts received by R. A. Sewell and Josephine M. Sewell from the sales and under the pledge contracts were paid by credits to their respective accounts and charges against the accounts of the vendees and pledgees on the company books. The aggregate number of shares sold outright on October 31, 1936 was equal to the aggregate number covered by the three pledge contracts executed on that day. The total of the prices received from the sales was equal to the total of the amounts advanced under the contracts. In the latter part of 1937 the pledgors exercised the options, granted by each of the contracts, to surrender the stock *416 covered thereby. Between the time the contracts were made and the options exercised the stock had increased in value approximately $18 a share. During 1937 Sewell Manufacturing Co. paid dividends aggregating 80 per cent of outstanding capital stock. On her income tax return for 1937, Josephine M. Sewell reported a taxable gain of $18,688.04 from sale or exchange of the 407 shares of stock in her name covered by the 1936 pledge contracts. On his income tax return for 1937, R. A. Sewell reported a taxable gain of $18,154.40 from sale or exchange of the 420 shares of stock in his name covered by the 1936 pledge contracts. The 1,301-3/20 shares of stock in the name of Josephine M. Sewell thus disposed of by outright sale and under the pledge contracts were the 1,000 shares and 300 shares transferred to her by R. A. Sewell in 1934 and 1936 as described in our findings of fact as to the first issue, and an additional 1-3/20 shares transferred to her by him on December 18, 1936. The respondent determined that the gains realized on the sales of all of those shares are taxable to R. A. Sewell, and that the gains on the shares covered by the 1936 pledge contracts are taxable in 1936 rather *417 than in 1937. Net income reported by R. A. Sewell was accordingly adjusted by addition of the following amounts: 1934
$ 5,859.34
1935
23,912.67
1936
Stock in name of
J.M.S.
$28,231.60
1936
Stock in name of
R.A.S.
18,154.40
$46,386.00
Other adjustments in capital gains reported on his 1935 and 1936 returns are not in issue. Opinion The questions here are whether the gains realized on the sales of Sewell Manufacturing Co. stock registered in the name of Josephine M. Sewell are taxable to her or to R. A. Sewell, and whether the gains realized on the stock covered by the 1936 pledge contracts are taxable in 1936 or in 1937. No question having been raised as to minor adjustments made by respondent in the amounts of some of the gains, we assume that their correctness is conceded. The first of the two questions here presented is governed by our holding on the first issue that R. A. Sewell remained the owner for tax purposes of the 1,300 shares of stock which he caused to be transferred to his wife's name. The petitioner has not shown the circumstances surrounding the transfer of the additional 1-3/20 shares on December 18, 1936, and upon brief does *418 not contend that they should be treated differently from the others. We hold that the gains realized on the sales of the 1301-3/20 shares of stock in the name of Josephine M. Sewell are taxable to R. A. Sewell. As to the second question, the respondent contends that the pledge contracts of 1936 are to be treated as contracts of sale with the right to repurchase reserved to the sellers, and therefore that the gains are taxable in 1936 rather than 1937. So to treat the transactions would require evidence that the real intention of the parties was other than what each of the executed contracts on its face represents it to be. The respondent argues that such evidence may be found in the surrounding circumstances, pointing out that nowhere in the contracts do the pledgors promise to repay to the pledgees the amounts of the loans; that the pledgors parted with title, possession and the benefits of ownership; that one of the pledgees held himself out as owner of the stock allegedly pledged to him; that the pledgees received by way of the dividends far more than a fair rate of interest on their money, and that between the time the contracts were executed and the stock was surrendered it had *419 enhanced in value about $18 a share. The contracts by their terms gave the pledgors the option of repaying the loans and taking up their shares or of surrendering the stock to the pledgees if it be worth the amount of the loan at the time of surrender. An obligation to pay the indebtednesses in the one manner or the other was clearly imposed. It is true that possession and the right to receive dividends passed to the pledgees and we may assume, arguendo, that they received title as well. Those factors are of little significance, however, since whatever passed is expressly provided to have passed as security for money loaned, and the receipt of dividends by the pledgees was to compensate them for the use of their money. The fact that the dividends were high worked to their advantage, but as the petitioner points out, even though they had been high in preceding years, there might very possibly have been none during the period in question, and in that event the pledgees would have loaned their money interest-free. The representation by one of the pledgees that he owned the stock assigned to him is of but slight force as against the pledgors. The respondent points to the further *420 fact that at the time the pledgors elected to surrender the stock in 1937 its value had substantially increased. But in our opinion that single circumstance will not warrant the conclusion that the transactions in question were sales rather than loans. The pledge contracts are in evidence. That evidence meets the presumption favoring the correctness of the respondent's determination, and establishes a prima facie case for the petitioner. The pledgors' decision to surrender rather than redeem may have been motivated by one or more of a variety of reasons, and we are not prepared to speculate as to what they might have been. The fact is that Sewell and his wife held contract rights to redeem if they wished, and had they done so there would be little reason on these facts to question the form of the transactions. That they did not does not require the inference that their true intention was to sell and that of the pledgees was to purchase the stock in 1936. Until the options were exercised there were not completed sales. It follows that the gains are taxable in 1937 rather than in 1936. On this question the respondent's determination is reversed. Findings of Fact as to the Sixth Issue *421 (Taxation of Profits of 1936-37 of Hat Business to R. A. Sewell, or to Pariners) We incorporate herein by reference the findings of fact as to the first issue, in so far as they relate to the proceeding of the estate of R. A. Sewell, and find the following additional facts: The amounts transferred from the account of Josephine M. Sewell to the credit of R. A. Sewell on the books of Sewell Manufacturing Co. were withdrawn and invested by him in the construction and equipment of a manufacturing plant known as Sewell Hat Manufacturing Co. By the close of the year 1935, he had withdrawn and so expended the $107,803.64 transferred from his wife's account during that year, and the additional amount of $54,220.41. By the close of 1936 the $114,451.80 so transferred to him during that year and the additional amount of $84,726.66 had been similarly withdrawn and invested. In the fall of 1935 R. A. Sewell became seriously ill and unable to operate his hat business. His brother, W. P. Sewell, agreed to buy it, and on October 14, 1935 a deed was executed and delivered to him. At that time W. P. Sewell agreed to reconvey the factory to R. A. Sewell for the same price then paid, if R. A. *422 Sewell should ever wish it. Having recovered from his illness during the early part of the following year, R. A. Sewell did request a reconveyance, and on February 27, 1936 W. P. Sewell accordingly executed a deed in his favor. For the year 1935 the hat business sustained an operating loss of about $18,000, the entire amount of which was claimed as a deduction by R. A. Sewell on his individual return for 1935. At different times during 1936, R. A. Sewell told his accountants and two other business associates that the hat business was being operated as a partnership, the members of which were himself and his wife and their four children. However, in financial statements filed by him for credit purposes he represented that on May 31, 1936 he was the sole owner. The capital account in the hat business ledger was opened August 31, 1935 under the caption "Investment - Capital - R. A. Sewell." On about March 15, 1937 the bookkeeper, acting on instructions from R. A. Sewell, added the words "and family" to the caption. At about the same time, also upon instructions from R. A. Sewell, the bookkeeper inserted a sheet in the ledger headed "(Memo) Division of Investment Account for year 1936 *423 R. A. Sewell and Family." That sheet reflects a credit balance in capital account of $380,098.66 as of December 31, 1936, and a breakdown of that amount as follows: R. A. Sewell
$159,025.27
Josephine M. Sewell
159,025.27
R. A. Sewell, Jr.
15,818.39
Joseph Sewell
15,417.24
Hugo Sewell
15,435.26
Helen Virginia Sewell
15,377.23 The figures for the above break-down were given to the bookkeeper by the accountant retained to examine the books of the hat business for preparation of a 1936 income tax return. Under date of March 19, 1937 the same accountant prepared a gift tax return for Josephine M. Sewell on which were reported gifts on January 1, 1936 of separate $15,000 interests in Sewell Hat Manufacturing Co., to each of her four children, R. A. Sewell, Jr., Joseph, Hugo and Helen Sewell. A partnership return for Sewell Hat Manufacturing Co., prepared by the same accountant and executed on March 19, 1937, reported net income of $10,311.05 distributable as follows: R. A. Sewell
40%
$4,124.43
Mrs. R. A. Sewell
40%
4,124.42
R. A. Sewell, Jr.
5%
515.55
Joseph Sewell
5%
515.55
Hugo Sewell
5%
515.55
Helen Virginia Sewell
5%
515.55 Josephine M. Sewell's *424 individual return for 1936, also executed on March 19, 1937, was prepared by the same accountant. Nothing was reported thereon as her distributive share of profits of the hat company. At about the time the foregoing income and gift tax returns were under preparation the accountant instructed one of his employees to prepare a trust agreement covering gifts from Josephine M. Sewell to her four children. The employee undertook the work at that time. When he had completed a proposed instrument, his employer or R. A. Sewell suggested the insertion of some additional provisions. The final draft incorporating the suggestions was completed on May 27, 1937 but bore date of June 1, 1936. It was between Josephine M. Sewell, party of the first part, and herself and R. A. Sewell, as trustees for their four children, party of the second part, and provided in part as follows: "WHEREAS, the party of the first part has this day purchased and paid for a three-fifths (3/5) undivided interest in a certain business, known as the SEWELL HAT MANUFACTURING COMPANY, located at Red Oak, Fulton County, Georgia, and whereas the undersigned desires to convey in trust for each of her following minor children, *425 to wit: Robert A. Sewell, Jr., Joseph Sewell, Hugo Sewell and Helen Sewell, an undivided one-twentieth (1/20) interest in and to all of the assets of said business, and all profits therein accruing from and after this date, upon the terms, conditions and powers hereinafter set forth, and "WHEREAS, the undersigned desires that her husband, Robert A. Sewell, who is the owner of two-fifths (2/5) undivided interest in the business, continue the active management and control of said business, both for himself and for the benefit of said minor children, and for the benefit of the party of the first part. "NOW THEREFORE, the party of the first part, in consideration of love and affection, does hereby transfer and convey unto herself and Robert A. Sewell, as Trustees for said named minor children, a one-fifth (1/5) interest, i.e., a one-twentieth (1/20) interest for each minor child, in and to said partnership, upon the following terms, conditions and powers, hereinafter set forth, that is to say: "1. The party of the first part does constitute, select, and appoint herself and husband, Robert A. Sewell, as Trustee for each of said described children during their minority, the said Trustees *426 to hold legal title to said respective partnership interests and assets, for the use and benefit of said minor children, and the said business shall continue from and after this date as a partnership consisting of the party of the first part owning an undivided two-fifths (2/5) interest, her said husband, Robert A. Sewell, owning an undivided two-fifths (2/5) interest, and the aforesaid Trustees holding the legal title for each of said minor children, to an undivided one-twentieth (1/20) interest for the use and benefit of said children." Josephine M. Sewell subsequently signed the instrument. It was later lost and has never been recovered. On October 16, 1940, she executed a carbon copy of the original. During the time that the trust agreement was under preparation, the employee who drafted it was engaged also in the preparation of a limited partnership agreement between R. A. Sewell, individually, as general partner, and Josephine M. Sewell, individually, and R. A. Sewell and Josephine M. Sewell as trustees for their four children, as limited partners. The final draft was completed at about the same time as the trust agreement and was executed under date of July 1, 1937. It provided *427 that R. A. Sewell and Josephine M. Sewell should each contribute to the capital of the limited partnership their separate undivided two-fifths interest in Sewell Hat Manufacturing Co., and that as trustees for their children they should contribute four undivided one-twentieths interests; that profits and losses be divided in proportion to the capital contributions; that R. A. Sewell have active charge of the conduct of the business, and be paid a salary therefor not to exceed forty per cent of net income of the business; and that in the event of the death of R. A. Sewell, the partnership should terminate. There had been no written partnership agreement affecting the hat business prior to the execution of the trust agreement and the limited partnership agreement in 1937. Under date of September 30, 1937 the capital investment accounts of R. A. Sewell and Josephine M. Sewell were debited $20,000 each, and credits of $10,000 each were entered in the accounts of each of the four children. At that time, it was agreed that the distributive share of profits of each child should be 8 1/3 per cent. A partnership return for Sewell Hat Manufacturing Co. for 1937 reported net income of $42,889.95, *428 before payment of salaries of $8,400 to R. A. Sewell and $3,000 to Josephine M. Sewell, leaving a balance of $31,489.95, distributable as follows: R. A. Sewell
$10,496.55
Jos. M. Sewell
10,495.55
R. A. Sewell, Jr.
2,624.22
Joseph Sewell
2,624.21
Hugo Sewell
2,624.21
Helen V. Sewell
2,624.21 Josephine M. Sewell reported the amount of $13,496.55 as income from the hat business on her individual return for 1937. The amounts reported as the distributive shares of profits of Josephine M. Sewell and of the four children, less withdrawals, were transferred in each of the taxable years and in subsequent years to the credit of their respective capital accounts. In 1937 withdrawals in the amount of $18,763.46 were charged to Josephine M. Sewell, and of $47.50 to each of the four children. R. A. Sewell died on January 16, 1940. Thereafter the hat business was operated by his widow and the children. In 1942 it was incorporated and has been oprated as a corporation since that time. The respondent determined that taxable income from the hat business was $11,670.43 in 1936 and $43,323.93 in 1937, and that the entire income for each year is taxable to R. A. Sewell. Opinion The *429 issue here is whether the hat business was owned and operated solely by R. A. Sewell during 1936 and 1937, or whether it was a partnership of which he and his wife and their four children were members. The petitioner concedes that R. A. Sewell was sole proprietor during 1935, but contends that a partnership was formed by an oral agreement as of January 1, 1936, between husband and wife individually and as trustees for the benefit of the four children, and that the interests of the latter were increased by gifts of additional capital interests in 1937 by both Mr. and Mrs. Sewell. The respondent's position, as we understand it, is that initially Mrs. Sewell had no interest in the business; that so far as appears she never purchased such an interest; and therefore she had nothing to transfer to the trusts which she created for the children, and nothing to retain for herself. A considerable portion of the evidence submitted on this issue has to do with the date on which the trusts for the children were created. Josephine M. Sewell and the accountant in whose office the trust instrument was prepared both testified that the actual execution occurred in 1936. A copy of a preliminary draft, *430 an unexecuted copy of the final draft and the copy of the final draft which was executed on January 16, 1940 were all introduced in evidence. The preliminary copy bears date of January 1, 1936; both copies of the final draft are dated June 1, 1936. The employee who prepared the instrument testified that his work was not completed until May 27, 1937, and that prior to that time the instrument had not been executed. He testified from permanent records which he had made contemporaneously with the preparation of the instruments on which were recorded the amounts of time spent and the nature of the work done by him in each week for his employer. He testified further that he remembered completing the trust instrument after having moved into a particular office building, and that the move was not made until March of 1937. The conflict in the evidence on this issue must be resolved in the respondent's favor, and we have accordingly found as facts that the instrument was prepared in 1937, and that it was executed by Mrs. Sewell at some time subsequent to its preparation. In disposing of the First Issue presented in these proceedings we held that the Sewell Manufacturing Co. stock registered *431 in the name of Josephine M. Sewell was to be considered for tax purposes as the property of her husband, the decedent. The moneys traceable to that stock which he invested in the hat business were likewise his own. Such investment, by itself, created no interest therein in his wife. If she and the children were the owners of capital interests in the taxable years, those interests must have been acquired, whether by gift or purchase, from the decedent. The interests of the children are alleged to have sprung from that of Josephine M. Sewell. The trust instrument executed by her recites that she purchased and paid for a three-fifths undivided interest in the business. Even if that instrument had been executed in 1936 we would be unable to say that it effected the transfer of interests in the partnership. Admittedly R. A. Sewell was a sole proprietor prior to 1936, and nothing in the record will justify a finding that he parted with any interest during 1936. The entries in the capital investment account reflecting the division of capital, the preparation of the gift tax return for Josephine M. Sewell, and of the trust indenture and the limited partnership agreement all occurred in 1937. *432 The work in connection with all of those matters was done under the direction or suggestion of the accountant retained to prepare an income tax return, and was begun at or about the time the return was under preparation. In our opinion the idea of the creation of a partnership was then hit upon for the first time, as an afterthought, for the purpose of minimizing the tax on the substantial profits which had been earned in 1936. We conclude that R. A. Sewell made no transfer of any interest in the hat business during 1936. It follows that its profits are taxable to him alone. With respect to 1937 we have the following additional facts: That in that year book entries were made transferring from the decedent's capital account to the credit of his wife and four children amounts approximating two-fifths and one-twentieth interests, respectively, and that the trust instrument and limited partnership agreement were executed. The record does not indicate the extent to which Mrs. Sewell participated in the management of the business, with the exception of the testimony of one employee that during 1933 she came to the office at regular intervals and discussed business matters with her husband, *433 but that she took no particular part in the actual running of the business. There is no explanation of the disposition made of the amounts charged to Mrs. Sewell and the children on account of withdrawals. In our opinion the additional facts are not sufficient to justify a holding in favor of the petitioner. It is true that a valid partnership between husband and wife or among husband, wife and children can exist for tax purposes, and we have held that the fact that the capital contributions made by the wife or the children were acquired by gift from the husband or parent is not determinative against the existence of such a partnership. See e.g. Jasper Sipes, 31 B.T.A. 709; Walter W. Moyer, 35 B.T.A. 1155; Justin Potter, 47 B.T.A. 607. The petitioner's position here, however, is not that the decedent made a gift of a capital interest in the hat business to his wife, but rather that she purchased such an interest with funds of her own. That position we have already held untenable. The execution of the partnership and trust agreements and the entries dividing capital account add nothing to *434 the evidence on this issue. The trust instrument recites a purchase by Mrs. Sewell of her interest and the partnership agreement provides for the transfer of portions of an existing capital interest. Neither purports to evidence a transfer to her by gift. Whether under different circumstances the performance of such acts, without more, would be held to establish prima facie gifts of a capital interest to Mrs. Sewell and by her in turn to the children need not be considered. We hold that the 1937 profits are taxable in their entirety to the decedent. Upon brief the respondent asserts that "There is too much uncertainty about petitioner's evidence for the Court to hold that a partnership existed prior to July 1, 1937. It is highly doubtful whether a partnership actually existed after that time except for the purpose of avoiding taxes." The brief also contains a request that we find as a fact that "the Sewell Hat Manufacturing was a sole proprietorship operated by R. A. Sewell, individually, from February 27, 1936, to July 1, 1937, when the limited partnership went into effect." The petitioner interprets that statement and request as a practical admission that a limited partnership *435 was in existence after the execution of the agreement of July 1, 1937. We can not agree. Although the purport of the statements is not entirely clear, we think it apparent from reading the brief as a whole that the respondent does not concede that a limited partnership came into existence in 1937. It requests that we find as a fact that "Mrs. Josephine M. Sewell had no interest in the Sewell Hat Manufacturing Company at any time and, therefore, conveyed no interest to her four children under the alleged trust instrument dated June 1, 1936." The last point argued is that there is no error in the determination that "for the years 1936 and 1937 the entire net income" of the hat business was taxable to R. A. Sewell. We conclude that the statements in question were made in support of an alternative contention and not as a concession of error in the determination of the deficiencies. Findings of Fact as to the Seventh Issue (W. P. Sewell Farm Expense) In September, 1933, W. P. Sewell acquired a farm in south Georgia. He raised no crop in 1933, but after acquiring the farm and before the end of that year, he spent $9,062.79 for seed and fertilizer, which were used in the production *436 of the 1934 crop. The 1934 crop consisted of cotton and peanuts, which were planted early in 1934. In order to get a full crop of peanuts and cotton in south Georgia, it is necessary for a farmer to break and begin to prepare his land before the first of the year. The petitioner did not deduct the $9,062.79 on his 1933 return, but did claim that amount in 1934 as part of the expense of raising the 1934 crop. The 1934 crop was not sold in that year, but the petitioner reported $15,370.69 as its value, as income from farm operations. Expenses of $28,429.22 were claimed resulting in a reported loss in the amount of $13,058.53. The respondent determined that under section 23 (e) of the Revenue Act of 1934 the 1933 expenses are not allowable as a deduction in computing the loss from farm operations for 1934. Opinion The petitioner seeks to justify the deduction in 1934 of the expenses here in question under one of the provisions of (A)-11 section 19.23 (a)-11 of Treasury Regulations 103. The corresponding provision of Regulations 86, applicable to the year 1934, is substantially the same as that to which petitioner refers, and is printed in the margin. We find no support for the petitioner *437 in that provision. There is no proof that the Commissioner consented to the determination of expenses on the crop basis. Moreover the petitioner could not have brought himself within the provision, since his own testimony was to the effect that his crops were planted early in 1934 and harvested in the latter part of the same year. The petitioner argues that the seed and fertilizer purchased in 1933 were used in the production of the 1934 crops, and that since he reported as income for 1934 the estimated value of the peanuts and cotton on hand at the close of that year, allowance must be made for expenses incurred in producing that income. The same argument could be made with equal force had the 1933 purchases been stored until 1935 or a later year and then used for the production of a crop. It can not serve to defeat the long recognized requirement that income taxes be assessed on the basis of annual returns showing the net result of a taxpayer's transactions during a fixed period, either the calendar year or at his option a particular fiscal year. Burnet v. Sanford & Brooks Co., 282 U.S. 359. The petitioner has not shown that he was not on a cash *438 basis in 1933, therefore the expenses incurred in 1933 are not shown properly deductible in 1934. On this issue we sustain the respondent. Findings of Fact as to the Eighth Issue (R. B. Sewell Traveling Expenses) R. B. Sewell was engaged as a salesman for the Sewell Manufacturing Co., and during each of the years 1935, 1936 and 1937 spent approximately 300 days on business away from home. His sales territory embraced all of Alabama and portions of Florida, Tennessee and Kentucky. His sales in each year amounted to about a half-million dollars. All traveling expenses incurred by the petitioner, including expenses for meals and lodging, and for business telephone calls and telegrams, were paid by him personally. He received no reimbursement from the company for any of these expenditures. The petitioner kept no accurate records of expenses incurred by him while on his business trips. We find that he expended an average of $5.00 a day for actual lodging for 300 days in each year, and not less than the following additional amounts for business telephone calls and telegrams: 1935
$626.52
1936
624.54
1937
683.00 Deductions claimed on the returns, including the above *439 listed amounts for telephone and telegraph, and additional undisclosed amounts for lodging, meals and travel were as follows: 1935
$ 8,716.14
1936
14,093.44
1937
16,934.39 The respondent permitted the deduction of $1500 a year for hotel accommodations, but disallowed the amounts claimed for telephone and telegraph, reducing the total deduction allowable in each year to the following amounts: 1935
$ 8,056.06
1936
12,546.80
1937
14,674.48
Opinion The proof submitted on this issue consists of the petitioner's testimony of the estimated cost of hotel rooms and of telephone calls and telegrams, and of one exhibit, consisting of receipted bills for accommodations and services furnished him on different days in 1936 by a hotel in Birmingham, Alabama. He testified that he had other receipted bills and canceled checks for expenses paid by him, but that those introduced in evidence were typical. On direct examination he testified that the cost of hotel accommodations averaged $10 a day and that telephone and telegraph expenses averaged $4.00 a day. On cross examination he testified that his lodgings cost him $3.50 to $15.00 a day. The record does not disclose the items *440 making up the deductions claimed on the returns with the exception of the telephone and telegraph expense, nor can the particular items as to which the respondent made adjustments be ascertained. The petitioner has the burden of proving error in the respondent's disallowance of portions of the claimed deductions. N. H. Van Sicklen, Jr., 33 B.T.A. 544. It has been recognized that absolute certainty in such matters as are here involved is impossible and unnecessary, Cohan v. Commissioner, 39 Fed. (2d) 540, but the impossibility of exactitude does not excuse the petitioner from furnishing as definite proof as is reasonably possible. See Rugel v. Commissioner, 127 Fed. (2d) 393, 395. Here he did not offer the canceled checks and receipted bills which he admittedly possessed, with the exception of the one exhibit showing amounts paid for accommodations at one hotel on some thirty different days during 1936. That evidence, either alone or in conjunction with the petitioner's estimates of his hotel expenses, will not justify a holding that the respondent's allowance of $1500 in each year was *441 inadequate. We think the respondent erred in disallowing the amounts claimed as telephone and telegraph expenses. The petitioner's sales territory covered a wide area, in which he sold large volumes of merchandise. It would be unlikely that in servicing such an area and transacting such a business he would not find it necessary to make extensive use of telephone and telegraph. His own estimate that the cost therefor averaged $4.00 a day does not seem to us unreasonable. However, the reasonableness of that estimate need not be decided. It is our opinion that the amounts expended were not less than those claimed on the returns. The respondent's action disallowing them is reversed. Ultimate Finding of Fact as to the Ninth Issue (Fraud Penalties) No part of any of the deficiencies determined against W. P. Sewell and R. B. Sewell is due to fraud with intent to evade tax. Opinion In Docket No. 112298 (W. P. Sewell), the respondent's answer affirmatively alleged that the petitioner, with willful intent to evade income taxes, filed false and fraudulent returns for each of the years 1934, 1935, 1936 and 1937, in failing to report in his income the dividends paid in those years on *442 the Sewell Manufacturing Co. stock registered in the name of his wife, and in failing to include the interest credited to his wife on the books of that company. In Docket No. 112299 (R. B. Sewell) the answer alleges that the petitioner filed false and fraudulent returns with intent to evade income taxes for each of the years 1935, 1936 and 1937, in failing to report as income the dividends paid in those years on the Sewell Manufacturing Co. stock registered in the name of his wife, and in failing to report certain interest income in 1937. The allegations of fraud were denied by reply filed in each case. The answer in Docket No. 112339 (Estate of R. A. Sewell) contains no affirmative allegations in support of the fraud penalties there determined. At the hearing, respondent's counsel expressly stated that those penalties would not be asserted. In our decision of the Second Issue we held that interest credited to the wife of W. P. Sewell was not taxable to him with the exception of the $69 credit of May 1, 1935 which we held to be interest on dividends credited to her account but taxable to the petitioner. Upon brief the respondent concedes that most of the interest income which he determined *443 R. B. Sewell had omitted from his 1937 return was not in fact taxable income, and no evidence has been introduced with regard to the small balance as to which error is not confessed. For purposes of the present issue therefore, we need decide only whether the petitioners failed to report the dividends credited to their wives, and the one item of interest credited to the wife of one of them fraudulently with intent to evade tax. We hold that they did not. The respondent recognizes that he has the burden of establishing the fraud which he has charged. Satisfaction of that burden requires more than a mere preponderance of evidence. See Frank A. Maddas, 40 B.T.A. 572, 578, and cases there cited, aff'd 114 Fed. (2d) 548. It has been said that the evidence of fraud must be "clear and convincing," Griffiths v. Commissioner, 50 Fed. (2d) 782, 786; Oscar G. Joseph, 32 B.T.A. 1192, 1205; A. W. Mellon, 36 B.T.A. 977, 1054, and that it must establish more than suspicion or more than a mere probability of dereliction, J. William Schultze, 18 B.T.A. 444, 447, *444 that it must reveal a "specific purpose to evade a tax believed to be owing," Mitchell v. Commissioner, 118 Fed. (2d) 308. In our opinion the evidence of fraud in the instant proceedings does not meet those tests. It is one thing to hold that the petitioners did not make completed gifts of the stock transferred to their wives, but quite another to say that their failure to report the dividends thereon was motivated by fraud and unlawful intent. See Oscar G. Joseph, supra.It is possible that they had the opinion that what they did was legally sufficient to relieve them of liability for tax. If in fact they did, no fraudulent intent existed. Cf. Court Holding Co., 2 T.C. 531, 541. We disagree with their contention that the transfers had that effect but cannot say that they were shams designed to evade tax. A careful review of all the evidence does not clearly and convincingly establish fraudulent intent, and the doubts which it leaves must be resolved against the respondent. We hold that the petitioners are not liable for the penalties asserted. Decisions will be entered under Rule 50. *445 Footnotes
1. The nature of some of these transactions, as sales or loans, is in controversy in connection with the fifth issue.↩
2. These are some of the transactions referred to in footnote 1, supra.↩
3. This note was actually made payable to W. P. Sewell.↩